IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RIVERSTONE CONSULTANCY INC.,<br><br>                              Plaintiff,<br><br>    v.<br><br>TETHER HOLDINGS LIMITED,<br>TETHER OPERATIONS LIMITED,<br>TETHER LIMITED, and TETHER<br>INTERNATIONAL LIMITED,<br><br>                              Defendants. | Case No. 25-cv-8454<br><br>COMPLAINT<br><br>Jury Trial Demanded |

Plaintiff ("Plaintiff") Riverstone Consultancy Inc., by and through its attorneys KEVIN KERVENG TUNG, P.C., for its Complaint against Defendants Tether Holdings Limited, Tether Operations Limited, Tether Limited, and Tether International Limited (collectively, "Tether" or "Defendants", and each a "Defendant") hereby alleges as below:

**STATEMENT OF THE CASE**

1. Plaintiff brings this action to seek relief for its USDT (as defined *infra*) frozen by Tether.

2. A cryptocurrency is a digital asset designed to work as a medium of exchange and/or a store of value. Cryptocurrencies leverage a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

3. Tether is the central authority over the cryptocurrency called "tether," or "USDT" — one of the world's first "stablecoins." While most cryptocurrencies are not backed by tangible assets, "stablecoins," such as USDT, aim to solve the volatility inherent in cryptocurrency by pegging themselves to a tangible asset such as gold or fiat currency held in reserve such as U.S.

1

Dollars. Unlike the underlying asset it represents, a stablecoin can be transferred between parties across borders instantaneously with minimal cost.

4. On the official Tether platform (tether.to), Tether promises that "whether it is for personal use or business purposes, Tether tokens offer many benefits as the most stable, liquid and trusted stablecoin." In its words, "Tether tokens are among the most traded tokens in terms of daily volume, offering unequalled liquidity" and Tether provides "[f]ast transfers across the world without the worry of legacy banking delays."

5. Contrary to what Tether has promised, it improperly and unreasonably froze Plaintiff's USDT through Tether's smart contract functions on the excuse of complying with a Bulgarian local police department request and prevented Plaintiff from accessing or transferring the funds (worth about $44.72 Million dollars). The inability to sell, buy or trade cryptocurrency leads to severe financial loss. Making matters worse, Tether failed to timely respond to Plaintiff pleas for support and help, and Tether has been earning interest from the reserved assets backing the USDT.

6. As a result of aforementioned Tether's conduct, Plaintiff has been damaged through the loss of its use or transfer the funds and investments in the USDT and, among other things, its investment opportunities. Accordingly, Plaintiff seeks damages and equitable relief.

## PARTIES

7. Plaintiff is a corporation duly organized and existing under the laws of the State of Texas and having its principal place of business located at 7001 Cooperate Dr STE 346, Houston, TX 77036.

8. Upon information and belief, Defendant Tether Holdings Limited is incorporated in, and a citizen of, the British Virgin Islands. It is the holding company of Defendants Tether Limited, Tether Operations Limited, and Tether International Limited.

9. Upon information and belief, Defendant Tether Operations Limited is incorporated in, and a citizen of, the British Virgin Islands ("BVI"). It is the entity that interfaces with Tether's U.S. customers that seeking to trade USDT.

10. Upon information and belief, Defendant Tether International Limited is incorporated in, and a citizen of, the British Virgin Islands. It is the entity that interfaces with Tether's non-U.S. customers that seeking to trade USDT.

11. Upon information and belief, Defendant Tether Limited is incorporated in, and a citizen of, Hong Kong. Tether Limited is the entity that issues USDT.

## JURISDICTION AND VENUE

12. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), in that this is a civil action between citizens of Texas, citizens of British Virgin Islands and citizens of Hong Kong, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13. Venue lies within this District under 15 U.S.C. § 22, 18 U.S.C. § 1965, and 28 U.S.C. § 1391 because Defendants transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

14. This Court has personal jurisdiction over each Defendant, because each Defendant transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of their illegal conducts, in the United States, including in this District. The damage was directed at,

and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

15. The Court also has quasi in-rem jurisdiction over the Defendants because Tether (USDT) is backed by US Dollars held in reserve and stored at Cantor Fitzgerald based in NY, and at other financial institutes or custodians.

## FACTUAL ALLEGATIONS

### A. Background

16. Tether is a cryptocurrency stablecoin, launched by the company Tether Limited in 2014. As of January 2024, Tether's website lists fourteen protocols and blockchains on which Tether has been minted. It is the largest cryptocurrency in terms of trading volume, commanding 64% of the market share among stablecoins and having surpassed Bitcoin in 2019 to become the most traded cryptocurrency in the world. As of Q1 2025, Tether accounts for roughly 68.2% of the global stablecoin market share.

17. Tether's beginnings trace back to July 2014, when a startup called Realcoin claimed it had produced the first stablecoin that would "be backed one-to-one by a fully auditable reserve of dollars." Realcoin was founded by investor Brock Pierce, its first CEO Reeve Collins, and software engineer Craig Sellars. According to Collins, by issuing realcoins they were "digitizing the dollar and giving that digital dollar access to the Bitcoin blockchain."

18. Collins stated that realcoins would "be introduced or removed from circulation depending on whether dollars are being added or redeemed." He also claimed that Realcoin had already found a "major banking partner," that it would "maintain a real-time record of its dollar-based reserves," and that its "lawyers [were] working to obtain U.S. money transmitter licenses from those states that require them."

19. In November 2014, Realcoin renamed itself Tether and rebranded realcoins as "tether" or USDT, the ticker under which the token is listed on cryptocurrency exchanges around the world.

20. One month later, on October 6, 2014, Tether issued its first batch of stablecoins, "printing" 100 USDT — allegedly equivalent to $100.

21. After the rebranding, Collins reiterated the Realcoin promise. He publicly asserted "that the number of [USDT] in circulation will always equate to the dollars in its bank account" and "that there are no pegs or formulas that complicate the process for its partners." He was unequivocal about the implications: "When you want to redeem them, we issue you cash."

22. On the official Tether platform (tether.to), Tether promises that "whether it is for personal use or business purposes, Tether tokens offer many benefits as the most stable, liquid and trusted stablecoin." In its words, "Tether tokens are among the most traded tokens in terms of daily volume, offering unequalled liquidity" and Tether provides "[f]ast transfers across the world without the worry of legacy banking delays."

23. Plaintiff reasonably believed that Tether would provide the most stable, liquid and trusted stablecoin it promised.

**B. Tether Uses the Smart Contracts to Manage the USDT Issued by it**

24. Tether smart contracts are programs that execute specific instructions, like minting or burning tokens, on a blockchain like Ethereum or Tron.

25. Tether utilizes smart contracts on various blockchains to maintain the USDT's pegging to the value of the U.S. dollar and to facilitate the issuance, transfer, and redemption of USDT.

26. Upon information and belief, Tether usually uses smart contracts to manage USDT in the following ways[1]:

   a) Issuance and Redemption. Tether Limited is the centralized entity responsible for creating and destroying USDT tokens:

   - Issuance: When a user deposits USD with Tether Limited, an equivalent amount of USDT is minted using a smart contract and sent to the user's blockchain wallet.

   - Redemption: When a user redeems USDT for fiat USD, the tokens are sent to Tether and burned via a smart contract. The user receives fiat funds off-chain. These minting and burning actions are initiated off-chain by Tether Limited but executed on-chain through smart contracts.

   b) Token Transfers. Once USDT is issued, it operates like any other cryptocurrency:

   - Users can send and receive USDT using wallets that support the underlying blockchain.

   - The smart contract maintains a ledger of balances and ensures transfers comply with rules (e.g., sufficient balance, no blacklisted addresses).

   c) Blockchain Support. Tether operates on multiple blockchains. Each blockchain has its own implementation of USDT via smart contracts or token standards:

   - Ethereum: USDT is an ERC-20 token.

   - Tron: USDT is a TRC-20 token.

   - Solana: USDT is a native SPL token.

---

[1] https://www.bankrate.com/investing/what-is-tether-stablecoin/; and https://www.investopedia.com/terms/s/smart-contracts.asp.

- Algorand, Avalanche, Polygon, Omni, EOS, etc., also support USDT with compatible token contracts.

  Each smart contract implementation aligns with the blockchain's token standard and handles transfers, balances, and permissions accordingly.

d) Compliance and Controls. Tether has implemented features in some of its smart contracts to enable:

- Freezing of addresses: In cases of theft or regulatory issues.
- Blacklisting: Preventing certain addresses from sending or receiving USDT.

C. **Plaintiff's Acquiring of the USDT Issued and Managed by Tether**

27. Plaintiff has been assigned from the Assignor (the name of whom is not disclosed here) the ownership of wallets with the USDT issued by Tether that purportedly enable it to conduct transactions in cryptocurrency 24 hours a day, 7 days a week and 365 days a year.

28. The subject USDT are stored in eight (8) cold and offline wallets with the following addresses:

  a) First Address: TAbEFocjtbN1KGtdBdbwzememXo3t6D1rJ;

  b) Second Address: TN9PUMnijvHVjGmyrB53m3uHq9E1oTwikP;

  c) Third Address: TQcDEM3TwRZ39cgB1Wejb91b5YnkRoizKs;

  d) Fourth Address: TXDFHLtENbxDru539NwUmeLwWzxpRFtbte;

  e) Fifth Address: TQXgRscPiA3YXpgndNBUCdA8qdrnyLvTs8;

  f) Sixth Address: TJbnyjtsSnjdtixkMv669GSLvNCN7JBSRb;

  g) Seventh Address: TAza2QhwZnk2affATf9bxNXw7xJdnP1Rj1; and

  h) Eighth Address: TX2imcKEoPXPV1XUF2t8cYZ8kzixy8K1AX (collectively referred to as the "Wallets").

29. A cold wallet is a cryptocurrency wallet that keeps private keys offline, offering high security by preventing exposure to online threats like hacking and malware. Examples include hardware wallets (physical devices like USB drives) and paper wallets[2].

30. Even though Plaintiff's Wallets are maintained offline (meaning not connected to the internet), the Wallets are subject to the restrictions imposed by Tether through the smart contracts. Tether can take on-blockchain administrative actions, such as freezing the USDT tokens in the Wallets, rendering those USDT tokens non-transferable.

### D. Tether's Illegal Freezing of the USDT in Plaintiff's Wallets

31. On or about 4th April 2025, Tether notified the Assignor that the USDT in its Wallets was frozen because Tether received a request from a Bulgarian police department to hold the USDT.

32. Upon information and belief, Tether frozen the USDT in Plaintiff's Wallets by taking on-blockchain administrative action through Tether's smart contract functions.

33. Tether never showed Plaintiff any documentation that it had the legal right or authority to freeze the USDT in the Wallets.

34. Instead, Tether directed Plaintiff to contact the Bulgarian police, when Plaintiff contacted Tether's attorneys regarding the frozen USDT. However, the Bulgarian police failed to respond to Plaintiff's inquiry regarding the frozen USDT.

35. Upon information and belief, Tether did not follow the proper procedures to freeze the assets in the Wallets. The freezing request was made by a Bulgarian authority in connection with a criminal matter; however, under Bulgarian treaties with foreign countries on international

---

[2] See https://www.stonex.com/en/financialglossary/coldwallet/#:~:text=A%20cold%20wallet%2C%20also%20known,ways%20to%20store%20digital%20assets.

criminal judicial assistance, any request of seizing or freezing assets in a foreign country should go through particular procedures requiring exchange and file information between Bulgarian central authority and the foreign affairs liaison authority in the foreign country. Tether violated these procedural requirements by freezing the USDT in the Wallets based solely on a simple request from a Bulgarian local police department.

36. As a result, Plaintiff has been damaged by the loss of funds, loss of cryptocurrency assets, deprived of the use of its USDT funds and accounts preventing it from engaging in any authorized transactions including but not limited to, investing, spending, saving, earning, using, selling or withdrawing its cryptocurrencies, and related injuries.

37. Defendants' actions have irreparably harmed Plaintiff and Plaintiff has no adequate remedy at law.

## COUNT ONE
## Breach of Fiduciary Duty

38. Plaintiff hereby realleges and incorporates by reference all prior allegations as though fully set forth herein.

39. As the issuer and manager of the USDT (see paragraph 26 *supra*; Tether also plays the role to ensure USDT's 1:1 peg to the U.S. dollar and to manage the reserves that back it), Tether has a fiduciary relationship with Plaintiff, and must exercise the fiduciary duties it therefore owes with the utmost good faith, integrity, and in the best interest of Plaintiff.

40. As discussed herein, Tether claims that its USDT tokens deliver numerous advantages for both personal and business use, describing them as the most stable, liquid, and trusted stablecoin available. According to Tether, its USDT tokens rank among the most actively traded in daily volume, offering unmatched liquidity. Tether also highlights the ability to transfer

funds quickly across the globe, free from the delays typically associated with traditional banking systems.

41. Plaintiff entrusted Tether, as the manager of its valuable cryptocurrency assets.

42. As the custodian of its valuable assets, Plaintiff entrusted Tether to ensure its access to and control over its USDT assets and the full ownership and transferability of the USDT assets.

43. Defendants owe a fiduciary duty to Plaintiff to provide it with immediate access to the USDT assets.

44. Defendants owe a fiduciary duty to Plaintiff to protect the transferability of the USDT assets and Defendants owe a fiduciary duty not to interfere with Plaintiff's ownership in the USDT, unless with legitimate justifications through due process.

45. Defendants owe a fiduciary duty to Plaintiff to timely respond to and resolve its complaints regarding freezing issues that preclude Plaintiff's access to and ability to transfer the USDT cryptocurrency assets.

46. Defendants breached their fiduciary duty owed to Plaintiff to provide it with immediate access to the USDT assets.

47. Defendants breached their fiduciary duty owed to Plaintiff to protect the transferability of the USDT assets and Defendants breached their fiduciary duty not to interfere with Plaintiff's ownership in the USDT, unless under legitimate justification with due process.

48. Defendants breached their fiduciary duty owed to Plaintiff to timely respond to and resolve its complaints regarding freezing issues that preclude Plaintiff's use and transfer of the USDT cryptocurrency assets.

49. As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff has been damaged in an amount of at least $44.72 Million.

50. In addition to actual or consequential damages, Plaintiff is entitled to pre-judgment interest, attorney's fees and costs, along with any relief that this Court deems just and proper.

## COUNT TWO
## Unjust Enrichment

51. Plaintiff hereby realleges and incorporates by reference all prior allegations as though fully set forth herein.

52. Plaintiff conferred a benefit upon Defendants by allowing Defendants to manage Plaintiff's USDT.

53. Plaintiff also conferred a benefit upon Defendants because of Defendants' actions and decisions to freeze Plaintiff's USDT and to earn interest from the reserved assets backing the USDT.

54. As a result of Defendants' actions and omissions alleged herein, Defendants have been unjustly enriched at the expense of Plaintiff. Under principles of equity and good conscience, Defendants should not be permitted to retain any benefit generating from the assets held within Plaintiff's accounts.

55. Plaintiff is entitled to restitution of, disgorgement of, and/or the imposition of a constructive trust upon all fee revenue, income, profits, interest and other benefits obtained by Defendants at the expense of Plaintiff resulting from Defendants' actions and/or omissions alleged herein, all in an amount to be determined at trial. Plaintiff is also entitled to attorney's fees, costs and prejudgment interest, along with any relief that this Court deems just and proper.

## COUNT THREE
## Conversion

56. Plaintiff hereby realleges and incorporates by reference all prior allegations as though fully set forth herein.

57. Plaintiff has the right to possess or transfer the USDT assets owned by it.

58. Defendants have interfered with Plaintiff's ownership in the USDT, by freezing Plaintiff's USDT through smart contract functions, wrongfully and arbitrarily.

59. Defendants have asserted, and improperly maintain, dominion and control over Plaintiff's USDT cryptocurrency assets by freezing the USDT without legitimate justifications. It is notable that, at the time the USDT was frozen, the source addresses had not been identified or included on Tether's blacklist.

60. Defendants have allowed Plaintiff's USDT cryptocurrency assets to be frozen, and Defendants have benefited thereby by improperly freezing and retaining control over Plaintiff's USDT assets.

61. Defendants have benefited by generating interest from the reserved assets backing the USDT assets.

62. Plaintiff is entitled to restitution of, disgorgement of, and/or the imposition of a constructive trust upon all fee revenue, income, profits, interest, and other benefits obtained by Defendants at the expense of Plaintiff resulting from Defendants' actions and/or omissions alleged herein, all in an amount of at least $44.72 Million. Plaintiff is also entitled to attorney's fees, costs and prejudgment interest, along with any relief that this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable by right.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for relief as follows:

A. Defendants immediately shall provide Plaintiff with access to its USDT funds and cryptocurrency assets.

B.  Defendants immediately shall lift all restrictions on Plaintiff's USDT and Wallets and restore Plaintiff's ability to transfer the USDT.

C.  Defendants immediately shall return to Plaintiff all funds and cryptocurrency assets wrongfully taken from its access.

D.  A judgment for actual damages and compensatory damages in the amount of at least $44.72 Million.

E.  A judgment for disgorgement of interest, income and other profits.

F.  A judgment for all such other and further relief as the Court may deem just and proper, together with the costs and disbursements that Plaintiff has incurred in connection with this action.

Dated: Queens, New York
       October 13, 2025

>KEVIN KERVENG TUNG, P.C.
>*Attorneys for Plaintiff*
>
>/s/*Kevin K. Tung*
>By: Kevin K. Tung, Esq.
>Queens Crossing Business Center
>136-20 38th Avenue, Suite 3D
>Flushing, NY 11354
>(718) 939-4633